UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
RENEE CAMOIA,

                      Plaintiff,

                -against-

THE CITY OF NEW YORK, DR. ELOISE ARCHIBALD,
DR. MICHAEL MARSHALL, SERGEANT LANARIS,
SERGEANT HAMILTON, and SERGEANT WHYE (in
their individual and official capacities),

                      Defendants.
---------------------------------------------------------------X

THIRD AMENDED COMPLAINT

Docket No.: 09-CV-2545 (SLT)(LB)

Jury Trial Demanded

Plaintiff, RENEE CAMOIA, by her attorneys, White, Ricotta & Marks, P.C., as and for her complaint against the Defendants herein, alleges, upon personal knowledge and upon information and belief as to all other matters:

## JURISDICTION AND VENUE

1. This is a civil action brought pursuant to 42 U.S.C. § 1983 to redress discrimination against Plaintiff in the terms, conditions and privileges of employment of Plaintiff, as well as deprivation by the Defendants, under the policies, ordinances, custom and usage of all rights, privileges and immunities secured to Plaintiff by the Fourteenth Amendment to the Constitution of the United States and all the laws and statutes thereunder.

2. This action is also brought against the Defendant City of New York for its violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, as well as the Americans with Disabilities Act, and against all Defendants under the New York State Human Rights Law, Executive Law § 290 *et seq.*, the New York City Administrative Code

1

§ 8-101 *et seq.*, and any other cause of action which can be inferred from the facts set forth herein.

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

4. Venue is proper pursuant to 28 U.S.C. § 1391.

5. All prerequisites to the institution of this action have been met. A charge of discrimination was duly filed with the EEOC, a Right to Sue letter was issued on or about March 19, 2009, and this action was filed within ninety (90) days thereof.

## PARTIES

6. Plaintiff, Renee Camoia, was and still is a resident of Suffolk County.

7. Defendant, the City of New York ("City"), at all times hereinafter mentioned, was and is a municipality and a public employer.

8. Dr. Eloise Archibald ("Archibald") was, at all relevant times, the Director of the Psychological Services Section of the New York City Police Department ("NYPD"). Archibald aided, abetted, compelled and/or incited the unlawful treatment set forth below. Further, Archibald was and/or is responsible for the NYPD's maintenance and operation, including, but not limited to, the discipline of employees. Additionally, Archibald is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Archibald had the power to make personnel decisions regarding Plaintiff's employment.

9. Dr. Michael Marshall ("Marshall") was, at all relevant times, a Department Psychologist within the Psychological Services Section of the New York City Police Department ("NYPD"). Marshall aided, abetted, compelled and/or incited the unlawful treatment set forth below. Further, upon information and belief, Marshall was and/or is responsible for the NYPD's maintenance and operation, including, but not limited to, the discipline of employees. Additionally, Marshall is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Marshall had the power to make personnel decisions regarding Plaintiff's employment.

10. Sergeant Lanaris ("Lanaris") was, at all relevant times, a Sergeant of the NYPD within the Recruit Training School. Lanaris aided, abetted, compelled and/or incited the unlawful treatment set forth below. Further, Lanaris was and/or is responsible for the NYPD's maintenance and operation, including, but not limited to, the discipline of employees. Additionally, Lanaris is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Lanaris had the power to make personnel decisions regarding Plaintiff's employment.

11. Sergeant Hamilton ("Hamilton") was, at all relevant times, a Sergeant of the NYPD within the Recruit Training School. Hamilton aided, abetted, compelled and/or incited the unlawful treatment set forth below. Further, Hamilton was and/or is responsible for the NYPD's maintenance and operation, including, but not limited to, the discipline of employees. Additionally, Hamilton is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Hamilton had the power to make personnel decisions regarding Plaintiff's employment.

12. Sergeant Whye ("Whye") was, at all relevant times, a Sergeant of the NYPD within the Recruit Training School. Whye aided, abetted, compelled and/or incited the unlawful treatment set forth below. Further, Whye was and/or is responsible for the NYPD's maintenance and operation, including, but not limited to, the discipline of employees. Additionally, Whye is a policymaker charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Whye had the power to make personnel decisions regarding Plaintiff's employment.

## BACKGROUND FACTS

13. In or around early 2007, Plaintiff began the hiring process to become a police officer for the Defendant City.

14. As part of the City's hiring process for police officers, Plaintiff was required to qualify psychologically.

15. In furtherance of the City's psychological testing, in order to determine whether Plaintiff was qualified for the position of police officer, Plaintiff was required to provide a litany of information to the City, including background information regarding, *inter alia*, her past employment, education, arrest history, and medical history.

16. Plaintiff was also required to submit to a comprehensive medical examination, which included both a physical examination as well as psychological testing, as well as interviews with NYPD medical staff.

17. Plaintiff fully participated in all required testing and satisfactorily completed all testing. As a result, Plaintiff was determined by the City to be qualified to continue on to a written psychological examination.

18. In November 2007, Plaintiff was informed by Defendant Archibald that Plaintiff had satisfactorily completed the psychological examination, and was qualified for police work.

19. As a result, in January 2008, Plaintiff was sworn in as a police officer for the NYPD.

20. Plaintiff was assigned to the Recruit Training School (the Police Academy) to begin her police training.

21. Up until March 11, 2008, Plaintiff's police training proceeded without incident, and she completed all required training in a satisfactory manner.

### Perceived Disability Discrimination

22. In or around March 2008, Defendant City, upon information and belief, received an anonymous phone call at the Recruit Training School. The individual who placed the call alleged that Plaintiff was "bi-polar" and "angry."

23. Based on the information provided in this call, Defendants subsequently perceived Plaintiff to suffer from bi-polar disorder.

24. On or about March 11, 2008, Defendant Lanaris approached Plaintiff in an Academy classroom, while in the presence of other officers in training, and ordered Plaintiff, under

5

threat of suspension, to provide him with Plaintiff's mother's home telephone number. No explanation was provided for this request.

25. Defendant Lanaris proceeded to contact Plaintiff's mother and questioned her regarding Plaintiff's health, behavior, and lifestyle. Upon information and belief, this questioning was conducted in order to confirm that Plaintiff did, in fact, suffer from bi-polar disorder.

26. Defendant Lanaris also contacted Plaintiff's brother and questioned both Plaintiff's mother and brother regarding allegations that were made by the anonymous caller that Plaintiff had engaged in questionable behavior at a recent family function. These allegations were false. Upon information and belief, this questioning was conducted in order to confirm that Plaintiff did, in fact, suffer from bi-polar disorder.

27. Thereafter, Plaintiff was ordered to report to Human Resources, at which point, Plaintiff was confronted by two female members of human resources, who stated to Plaintiff that "we have been waiting to speak to you," and, "it is obvious that you have a problem."

28. These two women then bombarded Plaintiff with questions relating to her family and social lifestyles. Upon information and belief, this was done in an effort to confirm Defendants' perception that Plaintiff suffered from a mental disability, specifically bi-polar disorder.

29. In late March 2008, Plaintiff's brother received a phone call from Defendant Archibald, who questioned whether Plaintiff was taking any medication and if she had a bad temper.

6

Upon information and belief, this was done in an effort to confirm Defendants' perception that Plaintiff suffered from a mental disability, namely bi-polar disorder.

30. On or about May 7, 2008, Plaintiff was ordered to an interview with Defendant Marshall. At that interview, Marshall asked Plaintiff if she was having any difficulties within the Police Academy.

31. Plaintiff advised Marshall that she did not have any problems with the training, but when questioned further regarding her dealings with Lanaris and Human Resources, as outlined above and below, Plaintiff complained to Marshall regarding the discriminatory behavior of Defendant Lanaris and Human Resources.

32. Marshall did nothing to address these complaints, despite the fact that Marshall had an obligation to report these issues to the NYPD Office of Equal Employment Opportunity.

33. Rather, Marshall joined in the harassment and/or discrimination of Plaintiff. Specifically, Marshall began to bombard Plaintiff with a series of probative questions, essentially conducting a similar psychological interview to that which Plaintiff had previously completed. Upon information and belief, Marshall engaged in this behavior in an effort to confirm Defendants' perception that Plaintiff suffered from a mental disability, namely bi-polar disorder and/or in retaliation for Plaintiff's complaints of discrimination.

34. Among the questions posed to Plaintiff by Marshall, Plaintiff was asked questions regarding her personal lifestyle, her vanity, and was repeatedly asked whether she suffered from bi-polar disorder.

35. Despite Plaintiff's continued denials that she suffered from bi-polar disorder, Marshall did not believe her, and questioned why someone would make such an allegation if it was not true, and went on to question whether Plaintiff had ever been institutionalized and/or whether she had ever seen a psychologist or therapist.

36. In response to Plaintiff's denials of the questions/allegations posed by Marshall, Marshall began to yell at Plaintiff, calling her a liar, and stating that he would "find out the truth." Clearly, despite Plaintiff's denials, Marshall and Defendants believed Plaintiff suffered from bi-polar disorder.

37. Plaintiff was subjected to these questions and attacks by Marshall for several hours.

38. Marshall then ordered Plaintiff, under threat of suspension, to sign a HIPPA release so that he could obtain her personal medical records. Marshall threatened that if he did not received Plaintiff's medical records in two weeks, Plaintiff would be terminated, and that she "might as well fess up and tell the truth" regarding his belief that she suffered from bi-polar disorder.

39. On or about May 28, 2008, Plaintiff was again ordered to an interview by Marshall.

40. Marshall again harassed Plaintiff with questions of a similar nature to those which she was subjected to at their prior meeting.

41. On or about May 2008, Plaintiff met with her PBA Delegate, Police Officer Wallace, who advised her that the allegations against Plaintiff were unfounded and that she would graduate with her class.

42. Up to this point, there was no legitimate business reason for Plaintiff to be denied graduation from the Police Academy, as Plaintiff had satisfactorily completed all her training.

43. Nonetheless, on June 11, 2008, Plaintiff was placed on "Restricted Duty," which prevented her from graduating with her class and assuming the job duties and responsibilities of a NYPD police officer.

44. On June 13, 2008, Plaintiff asked Defendant Archibald whether Plaintiff would be re-interviewed by Defendant Marshall. Archibald responded "No."

45. When Plaintiff questioned Defendant Archibald further as to whether she would graduate with her class, Archibald told Plaintiff to "sit tight and be patient."

46. In fact, Plaintiff was not permitted to graduate with her class due to Defendants perception that she suffered from bi-polar disorder, and instead, on July 2, 2008, Plaintiff was assigned to Recruit Operations along with other holdover recruits.

47. On August 27, 2008, Plaintiff's employment was terminated. No reason or explanation was given for this action by Defendants. Upon information and belief, however, Plaintiff was terminated by Defendants due to Defendants' perception that Plaintiff suffered from bi-polar disorder, due to her complaints of discrimination, and/or due to her gender.

**Gender Discrimination**

48. In or around March 2008, at the meeting Plaintiff was called to in Human Resources, Plaintiff was subjected to gender-based, inappropriate statements. Specifically, Plaintiff was told by a female member of Human Resources that it had been reported that Plaintiff was a "stuck up lazy bitch." Plaintiff's similarly situated male coworkers were not similarly subjected to such gender offensive statements.

49. Moreover, Plaintiff was treated with a general air of disrespect through this "investigation" that was conducted by Defendants, to which her similarly situated male coworkers and/or her coworkers who were not perceived to be disabled were not subjected. Plaintiff's similarly situated male coworkers were not subjected to harassing and invasive interviews such as those Plaintiff was subjected to, as detailed above, by Marshall. In fact, Plaintiff's male coworkers each advised her that their interviews lasted five (5) minutes.

50. After Plaintiff was assigned to Recruit Operations, on July 2, 2008, Plaintiff began to be subjected to further acts of gender discrimination. Specifically, while in Recruit Operations, Plaintiff, along with other female recruits, were required to perform subservient tasks, including mopping and sweeping floors. Plaintiff's similarly situated male coworkers were not similarly required to perform these tasks.

10

51. Moreover, upon complaining regarding this discriminatory assignment of work, Plaintiff was advised by Defendant Hamilton that Plaintiff was ordered to clean the kitchen and the break room because "females have that special touch." Plaintiff's similarly situated male coworkers were not similarly ordered to clean the kitchen and break room, whereas two of Plaintiff's female coworkers were similarly assigned these duties.

52. Plaintiff was further ordered, on one occasion, by Defendant Whye, to scrape gum and paint off of the gym floor. Plaintiff's similarly situated male coworkers were not similarly required to perform these cleaning duties.

53. In fact, when Plaintiff handed the scraper to one of the male recruits, the male recruit threw the scraper at Plaintiff after she turned her back.

54. Defendant Whye did nothing about this, despite being aware of this incident.

55. Plaintiff has endured disparate treatment and a hostile work environment on account of her: (1) perceived disability, in violation of the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law, and the New York City Administrative Code; (2) gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Administrative Code ("NYCHRL"); and/or, (3) in retaliation for her complaints of discrimination, in violation of the ADA, Title VII, the NYSHRL, and the NYCHRL, as well as all applicable provisions of federal, state, and local law. The above action was also taken in violation of

the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

56. By reason of the foregoing, Plaintiff suffered a loss of earnings and benefits, future earnings and benefits, emotional damages and physical damages. Plaintiff is thus entitled to all forms of applicable compensatory damages, equitable relief, and any other damages and/or remedies under state and Federal law.

## CAUSES OF ACTION

57. Defendant, City, took the aforementioned adverse employment actions and/or subjected Plaintiff to an atmosphere of adverse employment actions and/or a hostile work environment based on Plaintiff's perceived disability, gender, and/or in retaliation for her complaints of discrimination in violation of the ADA, Title VII, the NYSHRL, and the NYCHRL.

58. While acting under color of state law, Defendant, City, deprived Plaintiff of her constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. 1983, and all related provisions of the New York State Constitution. Defendant City intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights. Such deliberate indifference may be inferred in the following ways:

   a. Defendant's custom or practice of discriminating against Plaintiff and/or subjecting her to a hostile work environment based on her perceived disability and/or gender. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

   b. Supervisors failed to properly investigate and address allegations of discrimination and/or harassment.

    c.    Inadequate training/supervision was so likely to result in the discrimination and/or harassment that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

    d.    Policymakers engaged in and/or tacitly condoned the discrimination and/or harassment.

59. The individual Defendants unlawfully participated in and/or permitted the unlawful conduct to perpetuate, without abatement, in violation of Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. 1983.

60. The individual Defendants unlawfully aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of the NYSHRL and the NYCHRL.

WHEREFORE, Plaintiff demands judgment against defendants for all compensatory, emotional, physical, and punitive damages (against the individuals), lost pay, front pay, injunctive relief, reinstatement and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Jackson Heights, New York
       March 7, 2013

Respectfully submitted,

WHITE, RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
8612 37th Avenue, Second Floor
Jackson Heights, New York 11372

By: _____
       Thomas Ricotta